**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE LEO M. GORDON, JUDGE

| | |
|---|---|
| SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX) )<br>                Plaintiff, )<br>    .v. )<br>UNITED STATES, )<br>                Defendant, )<br>  And )<br>AD HOC SHRIMP TRADE ACTION COMMITTEE )<br>  And )<br>AMERICAN SHRIMP PROCESSORS ASSOCIATION )<br>              Defendant-Intervenors. ) | Court No. 25-00030 |

**PLAINTIFF'S REPLY TO DEFENDANT'S AND DEFENDANT-INTERVENORS' RESPONSES TO THE PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

 

John J. Kenkel
International Trade Law Counselors, PLLC
8647 Richmond Hwy., Suite 623
Email: IntlTradeLawCounselors@outlook.com
Counsel for Plaintiff *Soc Trang Seafood Joint Stock Company (STAPIMEX)*

Dated: August 15, 2025

# TABLE OF CONTENTS

I.     Commerce's Use of Data from Commerce's Preferred Thai Cost of Doing Business Report as a Benchmark for Raw Land is Not Lawful Because It Is Not Supported by Substantial Evidence…………………………………………………………….....…1

II.    The PHIVIDEC Report Constitutes the Only Substantial Evidence on The Record for valuing the Raw Land Rented by STAPIMEX……………………………………………………………...8.

III.   CONCLUSION………………………………………………… ….12

# TABLE OF AUTHORITIES

**CASES**

*Allied Tube and Conduit Corp. v. United States,* 127 F. Supp. 2d 207, 220 (2000).......... 6

*Beijing Tainhai Indus. Co. v. United States,* 52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015)...6

*Heze Huayi Chemical Co. Ltd. v United States,* 532 F. Supp. 3d 1301, 1321. (Ct. Int'l Trade, 2021)…………………………………………………………………………………..5, 8.

*Home Meridian Int'l, Inc. v. United States,* 772 F.3d 1289, 1296 (Fed. Cir. 2014)……. ..…….5, 7

*Seah Steel Vina Corp. v. United States,* 950 F.3d 833, 842  (Fed Cir.2020) …………… .5

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States,* 268 F.3d 1376, 1382 (Fed. Cir. 2001 ......................................................................................................5

**STATUTES**

19 U.S.C. § 1677(5)……………………………………………………………………….12

# ARGUMENT

**I.  Commerce's Use of Data from Commerce's Preferred Thai Cost of Doing Business Report as a Benchmark for Raw Land is Not Lawful Because It Is Not Supported by Substantial Evidence.**

STAPIMEX hereby replies to the response briefs submitted by Commerce, and Defendant-Intervenors Ad Hoc Shrimp Trade Action Committee ("AHSTAC") and American Shrimp Processors Association ("ASPA"). Since the arguments of AHSTAC and ASPA are virtually identical to those of Commerce, STAPIMEX's reply encompasses comments made by those parties.

Commerce did not reasonably select the land rental data from the Thai Cost of Doing Business Report as the best available information to use as a benchmark for land.

There is no Thai data on the administrative record providing rental value solely for land, much less for raw land. There is data on the land for rental of raw land in the Philippines as demonstrated by the PHIVIDEC report placed on the record by petitioners. Accordingly, Commerce did not make a reasonable choice.

It is better to have precise data, *i.e.*, a benchmark value only for raw land, than imprecise, over-valued, non-comparable data for something STAPIMEX does not rent, *i.e.*, logistical structures, merely because the Thai data is dated and is in a location in Thailand Commerce finds to be comparable to the location of STAPIMEX's land.

There is not a single instance on the administrative record of either Commerce or petitioners citing any Thai Report and quoting prices for "land," much less "raw land." This by itself answers the question whether the Thai Report preferred by Commerce constitutes the best available information. It does not.

1

STAPIMEX argues that there are not one but two relevant Thai Reports on the record. Both of these reports were placed on the record by the petitioners. The first one was relied upon by Commerce: Thailand Board of Investment's Cost of Doing Business in Thailand 2023 Report (Cost of Doing Business Report). The Second is entitled "Thailand Logistics Property Market H1 2022." The first report is clear on its face: "rental industrial and logistics property." Nowhere on the administrative record has Commerce shown that this report is limited to rental of raw land. A reasonable mind can conclude that this is both for industrial land <u>and</u> land with logistical structures on it. The reason is because the second Thai Report expressly defines "logistical property."

On Page 1 of that second Thai Report, is the definition of "logistics Property:" "The total supply of <u>ready-built warehouses</u> in Thailand increased steadily by 3.2% H-O-H to 4.84 million Sq. M." (Id. at 1.) (emphasis added). Thus, all arguments by Commerce and the petitioners fail on their face. Commerce ignores substantial evidence on the record, placed there by petitioners, that "logistical property" is land with "ready-built warehouses" on it.

STAPIMEX rents only raw land and builds its factories and warehouses on that land. Of course, a reasonable mind will conclude that land with "ready-built" warehouse on it will be much more expensive than raw land. Thus, the logistical property containing "ready-built warehouses" cannot be considered comparable to raw land.

Thus, the Thai data relied upon by Commerce is artificially inflated vis-à-vis the situation of STAPIMEX, since it rents only raw land and built factories and logistical structures (warehouses) on it. Thus, even if petitioners had not placed the definition of "logistical property" in Thailand on the record, we can also turn to a neutral source, the dictionary, to determine what "property," "logistical" property, and "raw land" mean.

The reason is that no reasonable mind can compare raw land with land containing one or more "ready-built warehouses" on it as the best available information on the record.

2

A simple comparison of the terms "property," "logistics property," and "raw land" clearly demonstrates the chasm between the Thai data relied upon by Commerce and raw land, as provided for in the PHIVIDEC data.

# property

## noun

prop·er·ty ˈprä-pər-tē
plural properties
Synonyms of *property*

1 a **:** a quality or trait belonging and especially peculiar to an individual or thing

  b **:** an effect that an object has on another object or on the senses

  c **:** virtue sense 2

  d **:** an attribute common to all members of a class

2 a **:** something owned or possessed
specifically **:** a piece of real estate

  b **:** the exclusive right to possess, enjoy, and dispose of a thing **:** ownership

  c **:** something to which a person or business has a legal title

  d **:** one (such as a performer) who is under contract and whose work is especially valuable

  e **:** a book or script purchased for publication or production

3 **:** an article or object used in a play or motion picture except painted scenery and costumes

Source: https://www.merriam-webster.com/dictionary/property.

In its opening brief, Stapimex provided the definition of "logistics" as it applies to rental property.

> Logistics real estate is the real estate sector that responds to companies' logistics needs. In other words, logistics real estate involves the rental

3

and sale of warehouses, distribution centres, flexible spaces and other industrial buildings with storage facilities. Mar 27, 2025.

Source: https://www.google.com/search?q=definition+logistics&client=firefox-b-1-d&sca_esv=63876fbbe76b4a6d&channel=entpr&sxsrf=AHTn8zo0MPEobXtvQPm-YgtRSCxHmYMBJQ%3A1747279532900&ei=rF4laPrONq_U5NoPkM-dwQw&ved=0ahUKEwj61Ia_w6SNAxUvKlkFHZBnJ8gQ4dUDCBA&uact=5&oq=definition+logistics&gs_lp=Egxnd3Mtd2l6LXNlcnAiFGRlZmluaXRpb24gbG9naXN0aWNzMhAQABiABBiRAhiKBRhGGPkBMgUQABiABDIGEAAYFhgeMgYQABgWGB4yBhAAGBYYHjIGEAAYFhgeMgYQABgWGB4yBhAAGBYYHjIGEAAYFhgeMgYQABgWGB4yBhAAGBYKhAAGIAEGJECGIoFGEYY-QEYlwUYjAUY3QQYRhj5ARj0Axj1Axj2A9gBAUj7TlCMCVjrQnABeACQAQCYAV6gAc4HqgECMTa4AQPIAQD4AQGYAgD4AQGYGAhGgAtAIwgILEAAYgAYsAMYogTCAgsQABiABBiiBMICBxAjGIAEGKIEBiiBBMICBAAGKIFwgILEAAYgAYhgMYigXCAgsQABiABBiRAhiKBcICCBAAGBYYChjqEAAYgAYkQIYigUYRhj5ARiXBRiMBRjdBBhGGPkBGPQDGPUDGPYD2AEBwgIGEAAYBxgemAMAiAYBkAYDugYGCAEQARgTkgcCMTegB8MTa4B8cI&sclient=gws-wiz-serp

The definition of "raw land" is as follows:

raw land
noun [ U ]
uk
us

PROPERTY

land in its natural state, which has not been used or prepared for building on or growing crops on : Our company buys raw land - land prior to grading and subdividing for construction.

(Definition of **raw land** from the **Cambridge Business English Dictionary** © Cambridge University Press)

Source: https://dictionary.cambridge.org/us/dictionary/english/raw-land

The definition for "raw land," above, shows that raw land is a subset of "property."

"Property" is a very broad term, as defined in the dictionary, encompassing much more than "raw land." Think of "property" as "fruit." This is juxtaposed with "raw land" being a specific type of property – a specific type of fruit, e.g, orange.

Thus, STAPIMEX's raw land rental and PHIVIDEC raw land are both oranges. DOC has

4

made an impermissible fruit- (not even apples) to-oranges comparison by comparing a very broad "industrial and logistical property,"  provided in Commerce's preferred Thai Report, to the second Thai Report limited to logistical property and defining it as "ready-built warehouses."

Commerce and STAPIMEX both agree that the Department must use the best available information.  Commerce also admits that the data used as the benchmark must be "comparable" to the raw land rented by STAPIMEX.   Resp Br. at 5.  STAPIMEX again agrees.   STAPIMEX argues, however, that "comparable" information is only "comparable" when it is the best available information. In addition, Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information.  *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).  No reasonable mind can conclude that land containing "ready-built warehouses" is the best available information since it is not even remotely comparable to raw land.

While Commerce is required to use the best available information, it need not be perfect.

> Moreover, the court in *Seah Steel* found that "where, as here, Commerce finds that better information is not available . . . Commerce may use the financial statements of 'companies with differing integration levels." *Seah Steel, 950 F.3d at 841* (citing *Home Meridian, 772 F.3d at 1296*). Since, as discussed below, Commerce found that the Malaysian financial statements do not present a better alternative, the court agrees that Commerce's selection of CYDSA's financial statement as the best available here was reasonable. "The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect." *Home Meridian Int'l, Inc. v. United States, 772 F.3d 1289, 1296 (Fed. Cir. 2014).*

*Heze Huayi Chemical Co. Ltd. v United States,* 532 F. Supp. 3d 1301, 1321. (Ct. Int'l Trade, 2021).  Here, the administrative record has better information in the form of the PHIVIDEC report.  Commerce did not have to make a fruit-to-oranges comparison.  In fact, Commerce's preferred Thai Report does not constitute substantial evidence on the record.  Rather, only by using the

5

PHIVIDEC data – an oranges-to-oranges comparison – would Commerce have used the best available information, even though it was not perfect, according to Commerce, since it was not dated. It was, however, valid as of the date the petitioners downloaded the data from the internet, February 26, 2024, barely a year after the end of the POR. A further discussion of the PHIVIDEC data is presented, *infra*.

Simply put, while fruit and oranges are both fruit, they are not "comparable" enough to warrant their comparison because such a comparison will not produce a result that is calculated "as accurately as possible." Even an apples-to-oranges comparison does not constitute substantial evidence on the record when data is available to make an orange-to-oranges comparison.

Commerce's choice of the first Thai Report is distortive, because it takes land containing "ready-built warehouses" to compare to raw land rented by STAPIMEX. This renders Commerce's benchmark calculation unreasonable. The administrative record, in the PHIVIDEC data, has established evidence sufficient to overcome the deferential standard of review that applies to Commerce's factual determinations. Ultimately, STAPIMEX has demonstrated that its proposed benchmark, the PHIVIDEC data, is the only reasonable outcome on this administrative record. *See, e.g.,* . ("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its factual conclusions as the only reasonable outcome.").

Commerce admits that it may use data that is not identical. Resp. Br. at 4. *See Beijing Tainhai*. Thus, while the PHIVIDEC data is for identical raw land, it is a nearly identical in contemporaneity. Indeed, while the PHIVIDEC data was downloaded by petitioners on February 26, 2024, it may have been on the internet for some part, if not all, of 2023. This would make it valid within less than a year after the POI (period of investigation). Over the decades, when faced with surrogate value or benchmark data either prior to the POI or afterwards, Commerce has

6

routinely turned to the inflation factors for that country and either inflated the data in question or deflated it, as appropriate. Here, with the PHIVIDEC Report, the data would be deflated by only one year at most. That would make the PHIVIDEC data contemporaneous with the POI.

Commerce and Defendant-Intervenors have cited no authority to support a conclusion that use of less accurate, noncomparable data, *i.e.*, land containing "ready-built warehouses" (the so-called fruit-to-oranges comparison) precisely defined in the Thai Logistics Report submitted by petitioners, results in the calculation of a CVD margin that is as accurate as possible. When one has to choose between the use of comparable data and contemporaneity, the use of the most comparable always wins. It is simply nonsensical to make a fruit-to-oranges comparison simply for the sake of using data in the POI.

Moreover, Commerce and Defendant-Intervenors have not even attempted to make a nonsensical claim the "logistics property" in their preferred Thai Report is somehow different from "logistics property" defined in the second Thai Report.

A prime example of Commerce's predilection for using the most comparable, if not identical, data in a surrogate country to compare to data in non-market economies (NMEs) is its selection of surrogate values for financial statements in antidumping cases. Routinely, Commerce will reject financial statements in surrogate countries when they include products other than subject merchandise unless there is no better data.

> Moreover, the court in *Seah Steel* found that "where, as here, Commerce finds that better information is <u>not</u> available . . . Commerce may use the financial statements of 'companies with <u>differing integration levels</u>." *Seah Steel, 950 F.3d at 841* (citing *Home Meridian, 772 F.3d at 1296*). Since, as discussed below, Commerce found that the Malaysian financial statements <u>do not present a better alternative</u>, the court agrees that Commerce's selection of CYDSA's financial statement as the best available here was reasonable. "The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect." *Home Meridian Int'l, Inc. v. United States, 772 F.3d 1289, 1296 (Fed. Cir. 2014)*,

7

*Heze Huayi* at 1321 (emphasis added). "Differing integration levels" refers to a company making goods in addition to subject merchandise. Thus, the Federal Circuit simply requires identical information when it is available. Only when identical data is not available, will the court go to the next level, comparable data, and allow Commerce to use that since it becomes the best available information. Here, the PHIVIDEC data for raw land is <u>identical</u> to that rented by STAPIMEX. Therefore, by definition, it constitutes the best available information.

In essence, the courts have held that identical data is best, but comparable data may be used when it is the best available information. In the instant case, however, using the Thai Report would be a fruit-to-oranges comparison, which is not comparable must less identical.

## II. The PHIVIDEC Report Constitutes Substantial Evidence on the Record for Valuing the Raw Land Rented by STAPIMEX.

Commerce explains why it did not use the PHIVIDEC data. "Finally, Commerce determined that a webpage entitled "Cost of Doing Business" from the Philippines' PHIVIDEC Industrial Authority (PHIVIDEC Report) was 'unreliable' because (1) the land rental rate data is not dated, and (2) the webpage was 'unclear as to what the basis for the rental rates are.'" Resp. Br. At 8 (citation omitted).

Petitioners placed the PHIVIDEC Report on the administrative record on February 26, 2024, but now disavow it. It is clear that petitioners' goal is simply "forum shopping" to obtain the highest rate against STAPIMEX, rather than supporting the use of substantial evidence on the record. It is clear that Commerce and Defendant-Intervenors will go to any length to muddy the wares and not admit that the second Thai Report confirms that the first Thai Report encompasses land containing "ready-built warehouses."

PHIVIDEC data is for raw land. As STAPIMEX noted in its opening brief, the PHIVIDEC Report is replete with references to raw land. Commerce (Resp. Br. at 11) and

8

petitioners seem to argue that if the term "raw land" is not noted in every paragraph of that Report, then the absence of that term is sufficient to cast doubt on the Report itself. Neither Commerce nor petitioners cite any instance in the PHIVIDEC report whereby a reasonable mind could conclude that all references to land in that Report are for anything other than raw land.

STAPIMEX now agrees that the PHIVIDEC was undated. However, STAPIMEX argues that this data was valid as of the date petitioners downloaded it from the internet. Neither Commerce nor the petitioners have disavowed either (1) that the PHIVIDEC Report was effective on February 26, 2024, the date the petitioners downloaded it, or (2) its accuracy. The only question is: how long was that data accurate and what is the basis of the data? The administrative record does not show whether it applied only for one month (February 2024) or for one year, or for any other period.

What we do know is that Commerce's policy, when using surrogate values and/or benchmarks that are for a period after the POI, is to deflate that data to bring it back in time and make it commensurate with what it should have been in the POI. It is noteworthy that this method is a presumption on the part of Commerce: that the nation-wide inflation rate is applicable to all sectors of the economy of the surrogate country, include the sector at issue. This method is in accordance with longstanding, decades-long, policy of the Department. Thus, the use of post-POI data is not a problem at all. It is merely one set of circumstances that Commerce often finds itself in when dealing with data that is either pre- or post-POI. Accordingly, Commerce's arguments that this post-POI data is a major problem are unpersuasive.

Thus, there is not even a scintilla of evidence to support Commerce's decision that the PHIVIDEC Report is unreliable.

Accordingly, substantial evidence on the record demonstrates that The PHIVIDEC Report contains data for raw land. Only a benchmark for raw land is identical to what STAPIMEX rents.

9

This makes the PHIVIDEC data the best available data for the raw land that STAPIMEX rented in the POI because it is identical to the type of land rented by STAPIMEX. In other words, the PHIVIDEC data is not for land containing "ready-built warehouses." Therefore, only data in the PHIVIDEC Report will allow Commerce to calculate a CVD margin as accurately as possible.

Commerce consistently refers to the first Thai Report as "land rental" data. Nothing in that Report states that it solely concerns "land," much less "raw land." Neither Commerce nor petitioners have cited anything in that report to substantiate their claim that it is solely for land, much less that "logistical property" equates to land and nothing else. Since the Thai Report relied upon by Commerce does not define its terms for "industrial and logistical property," we can only rely on the second Thai Report regarding solely logistical property, which defines logistical property as land containing one or more "ready-built warehouses."

Even generally-accepted definitions for logistical property clearly define land that is much more than simply raw land. Given this, no reasonable mind can conclude that logistical property is comparable to raw land, much less identical. As stated above, the use of logistical property is to make a fruit-to-oranges comparison, rather than an oranges-to-oranges comparison which is only made when the PHIVIDEC data is used.

The PHIVIDEC data is more accurate than Commerce's preferred Thai Report since it is for raw land. While Commerce quibbles that it does not know the basis for the PHIVIDEC data, there is no serious question that the PHIVIDEC data is any less reliable than the Thai Report. In fact, the PHIVIDEC does show the basis for its prices. The data is clear on its face. It is only for land, with separate rental rates for various levels of commercial and industrial raw land, showing lease rates per square meter per year, as of February 26, 2024.

Thus, the PHIVIDEC data is more accurate than Commerce's preferred Thai Report because it reflects prices for raw land, rather than prices for land containing "ready-built

10

warehouses."

Commerce has to be held to the same standard it requires of interested parties when it analyzes record evidence. Commerce complains in its response brief (at 11), that the PHIVIDEC data shows no basis for its collection. "Moreover, the PHIVIDEC does not list the dates of the data used to compile its listed land lease rates." (citing its Final Decision Memorandum at 16-17.) This is simply one of many "red herrings" espoused by Commerce to deflect from the fact that its preferred Thai data encompasses "ready-built warehouse."

For the above reasons, STAPIMEX believes the PHIVIDEC data, on its face, is adequate for the Court to find that it constitutes substantial evidence on the record. Therefore, there is no missing PHIVIDEC data, e.g, dates of applicability, needed. Commerce can simply deflate the PHIVIDEC data to make it applicable to the POI. Only, as an alternative, should the Court not be convinced of the adequacy of the PHIVIDEC data and remands the case to Commerce with instructions to find the applicable dates for the PHIVIDEC data, might a re-opening of the administrative record by appropriate to try to find the dates for which the PHIVIDEC data was applicable.

Commerce (Resp. Br. at 14), tries to paint a picture that STAPIMEX is somehow at fault for not providing evidence of raw land rental rates on the record. Nothing in the Statute, the Department's regulations, or the Statement of Administrative Action requires a respondent to submit benchmark data for Commerce's consideration. This is simply a smokescreen – a red herring – to avert attention from the fact that the PHIVIDEC data is for the identical raw land that STAPIMEX rents.

Commerce also argues that STAPIMEX has waived the issue of searching the internet for information. This is not true. STAPIMEX's entire case brief and opening brief before the Court deals with information on the internet, whether it is the Thai Report or PHIVIDEC information.

11

Commerce is simply grasping at straws to find any way it can to prevent identical raw land data from being used. When a court remands a case to Commerce, the Department always is allowed, should it choose, to re-open the record for further information. Thus, this argument is unpersuasive.

Commerce also criticizes the PHIVIDEC report (Resp. Br at17). for not showing its sources of information. This is another red herring. PHIVIDEC is a government agency. There is no legitimate reason to question its data. Again, Commerce is not holding itself to the same standard that it requires of interested parties. There is no proof that the Thai report upon which Commerce relies is any more or less trustworthy. Thus, in fact, the PHIVIDEC data is superior to the Thai Report since it is showing prices for raw land, not second-hand information obtained by business consultants regarding land containing "ready-built warehouses.".

Finally, Commerce cites the Statute, 19 U.S.C. 1677(5), regarding prevailing market conditions. Resp. Br. at 18. Commerce's preferred Thai Report suffers from the same inadequacies as the PHIVIDEC Report. In the final analysis, the PHIVIDEC data is for the identical type of land, *i.e.*, raw land. The PHIVIDEC data was valid in February 2024. The PHIVIDEC data can be deflated to correspond to the POI.

### III.    CONCLUSION

Only the PHIVIDEC data provides price information for the identical type of land rented by STAPIMEX. The Thai data is for land containing "ready-built warehouses." Thus, the PHIVIDEC is the best available information and leads to a CVD margin being calculated as accurately as possible. Therefore, the PHIVIDEC data constitutes substantial evidence on the record.

As noted in STAPIMEX's opening brief, it was not only arbitrary and capricious, but an

abuse of discretion for Commerce to choose noncomparable "logistical property" (land containing "ready-built warehouses") rather than identical raw land provided in the PHIVIDEC data.

     For the reasons stated above, the Court should rule in accordance with the arguments contained herein. Thus, STAPIMEX respectfully requests this Court to remand this case to Commerce with the appropriate instructions.

                                    Respectfully submitted,

                                    */s/ John J. Kenkel*
                                    John J. Kenkel
                                    International Trade Law Counselors, PLLC
                                    8647 Richmond, Hwy, Suite 623
                                    Telephone: (703) 390-4064
                                    Email: IntlTradeLawCounselors@outlook.com
                                    *Counsel for Soc Trang Seafood Joint Stock Company (STAPIMEX).*

Dated: August 15, 2025

13

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, JUDGE

| | |
|---|---|
| SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX), )<br>Plaintiff, )<br>)<br>.v. )<br>)<br>UNITED STATES, )<br>Defendant, )<br>)<br>And )<br>)<br>AD HOC SHRIMP TRADE ACTION COMMITTEE )<br>)<br>And )<br>)<br>AMERICAN SHRIMP PROCESSORS ASSOCIATION )<br>)<br>Defendant-Intervenors. )<br>) | Court No. 25-00030 |

**Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 3,633 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

14

                                      Respectfully submitted,

                                      */s/ John J. Kenkel*
                                      John J. Kenkel
                                      International Trade Law Counselors, PLLC
                                      8647 Richmond, Hwy., Suite 623
                                      Telephone: (703) 390-4064
                                      Email: IntlTradeLawCounselors@outlook.com
                                      *Counsel for Soc Trang Seafood Joint Stock Company (STAPIMEX).*

Dated: August 15, 2025